Logistics Worldwide v. United States Please proceed, Mr. Claybrook. Thank you, Your Honor. One matter of housekeeping before I begin, if I may. I think the Court is aware that this proceeding is under a protective order, and I think it's not unlikely that some protected information might be disclosed during the arguments this morning, so I'd ask that the courtroom be cleared of all individuals. No, we're not going to clear the courtroom. You avoid saying whatever numbers. You can tell us what page to look in, and the confidential material. We'll avoid it. If we say it by mistake, raise it, and we can do something with the oral argument. It won't be posted at First Doctors, the four people in the audience. We're not going to clear them, but it will not be posted if you tell me before the end of the argument today that someone has revealed something confidential that they should not have. We will go through and extract that version. Thank you, Your Honor. The onus is on both counsel to ensure that they don't say something. Yes, and we've talked about that. This first appeal, Your Honor, deals with two mistakes that the agency made during the round two evaluation in this procurement. Both of these mistakes are highlighted by this uncontested fact. The total evaluated prices, or the TEPs, for both Crowley and for XPO are over $7 billion, but the internal government cost estimate, or what the actual cost of this procurement is going to be, is $2.65 billion. Now, why is there such a big difference between the TEPs and the actual expected price? It's because the agency in this solicitation has a multitude of line items in this IDIQ by that it never expects to use, but still included plug number quantities for them to get firm fixed prices in case they did need to use them. The agency wanted every potential origin and destination pair, or lane, it's called sometimes, that it could think of covered in the RFP, including by multiple transportation modes and by various time delivery requirements. Which brings us to the first mistake, the agency's failure to do a complete unbalanced pricing analysis, which is mandatory in IDIQ buys because they are one of the most susceptible to unbalanced pricing. Unbalanced pricing occurs when a bidder's pricing for some line items is significantly understated and other prices at bid are higher than those of other offerors. That's the unbalanced part of this. The agency's own analysis showed that Crowley significantly underpriced items, not expected to have as much traffic, and it bid higher than XPO on the traffic more likely to be used. But the agency, after determining this, never did an unbalanced pricing analysis to determine the key issue, the key issue being whether there's a reasonable possibility that Crowley's bid would not actually give the government the lower ultimate cost, considering both its higher and its lower pricing. Now XPO in its briefs shows what is obvious from looking at the basic numbers. Crowley's bid leaves a reasonable possibility that it will not give the government the lowest ultimate actual cost. Neither the government nor Crowley try to refute this with mathematical analyses of their own. In this circumstance, the law is clear. Crowley's offer must be rejected as a matter of law. I'm sure the judges have noticed, although the regulation says that the agency may reject, the case law, although not decided yet by this court, is uniform throughout the 11th, the 3rd, the DC circuit, and in GAO, that if materially unbalanced pricing exists, it would be arbitrary and capricious for the bid not to be rejected. That's the situation we're in here. Now the government argues that XPO's protest on this ground was not timely. The Court of Federal Claims disagreed and it was correct. The basic question is how could XPO know the agency wouldn't do a full unbalanced pricing analysis? Can you step back and explain to me in a little bit of concrete detail what you think the agency had to do to carry out a sufficient unbalanced pricing analysis, holding as fixed the thing that I think you probably clearly did have to complain about earlier, which is the inclusion of all the line items that make up the TEP? Well, there's no need to complain about that. They use historical pricing, or excuse me, quantities when they have them. So hold that as fixed. Now explain what the agency should have done to figure out whether one or the other was going to give the government a better deal. When you find that you have unbalanced pricing like there was here, then you have to determine what's the probability that I'm going to get the benefit of that really good low pricing versus what's the probability I'm going to have to pay higher prices selecting these people. So in that case, in this particular situation, even though you didn't have historical pricing for the majority of the line items or lanes as they set them out, the 440,000 of them, you had to take a look at, all right, we do have historical practice on the incumbent contract, which covers about 95% of this job, and so what is the breakout there? And that's what we've been talking about in our briefs. That breakout was about 85-15. So once you get this TEP, what you know by definition is giving you exaggerated numbers. It's not right. It's not fitting up to the market. You say, okay, is that in the area that I'm most likely, we've got really low pricing as we have here, is that in the area we're most likely to be able to utilize or not? And in this situation, it's not. So there are different ways you can do it. We outlined some of those in the briefs, but they all end up with the same conclusion that the government has a reasonable possibility of not getting the best price here, the lowest ultimate price. Mr. Clearbrook, your response to Judge Toronto's question seems to assume that unbalanced pricing in fact occurred here in XBO's bid, or is it Crawley's bid? Crawley, yes, Your Honor. Sorry. And I guess what I'm wondering is the agency concluded there remains no indication of unbalanced pricing. So the first question is, what is it that the agency needed to do in your view that it did not do when it went through every lane line item indicating who's high, who's low, and then drew a conclusion at the end that there remains no indication of unbalanced pricing? What actually did they need to do more in your view that they did not do? They started out correctly, as you pointed out, Your Honor. They went through, they did a detailed analysis, and then they determined... They did a very lengthy detailed analysis. And then they determined that for particular slins, subcontract line items, the way they grouped them then, that Crawley's prices were, we pointed out three in particular, were way below the baseline they established. Now at that point, they were meant to do the analysis that I just talked about. They did not do that. As their own internal documentation shows, at that point they only looked at what they called unreasonably high pricing and asked questions about that. They never did the... That's a price reasonableness analysis. Am I going to have to pay an unreasonably high price for this? I guess what's confusing me in trying to think about this is knowing what is going to trigger a concern about potential unbalanced pricing. What number, what measurable item is there where now we have to be genuinely concerned about that? I have no real way of thinking about that. Well, there's not... I know you feel like the numbers in here should have been enough to trigger it. I just can't be sure why that is necessarily so. And it is true, Your Honor, that the Federal Circuit has never had to look at this precise question. However, both GAO and the Court of Federal Claims have. And generally it's about the 10% level where the agencies have been consistently affirmed that that represents unbalanced pricing. I'm sorry, 10% of what, of what? Of a baseline that they analyze as saying here is the fair price, here's what the price should be. I'm sorry, and is that, is the baseline as you call it, is that an average of the bidder's offerings or do they go out in the marketplace and say, you know, this is going to be ridiculous. Home Depot sells it for this and Staple sells it for that or something. They can do it either way, Your Honor, as long as it's reasonable. In this case, they took an average of the three bidders and said, okay, that's going to be the baseline. I guess we compare and see whether there is unreasonably high and low pricing or if it swings back and forth. It's a situation of course, if all of a particular offeror's pricing across the board was low there's no unbalance. So you get a baseline, they did it here by averaging everything, and then they say, okay, if it's just teensy-weensy around it, that's not going to be a problem either. But when you've got to see... As I understand it, there were only three bidders here, right? It's not like there were 20 bidders and now we can see some very significant outlier deviating from the other 19. Here, there were only three and so it does make it a little less clear why one side might be off-base, especially when there's some evidence that maybe your bid for a couple of lanes was a little bit on the high side. You're confusing, again, like the agency did, excuse me, if I may put it that way, unreasonableness versus unbalanced. It doesn't really matter that much for unbalanced pricing analysis what you set as your baseline because you're just trying to figure out how do the prices between the offerors compare. If one is way lower, so definitely lower than what others are bidding, then you have to check it out because you've got an IDIQ situation of you don't know exactly what you're going to bid, you have to give that more stringent analysis. You do that by taking, in this case, by taking the historical usage and saying, okay, what's the likelihood I'm going to get the advantage of this low pricing or not? If I may move to the second. You're into your rebuttal time so you're using it up now. If you'd rather wait, you can. All right. Thank you, Your Honor. The second issue, the same problem, doesn't deal with the unbalanced pricing, but when it came to looking at the tradeoff of our superior performance, XBO superior performance, against the price, the government only looked at the TEP difference. Arithmetically, you know that's wrong because it's three times what the expected actual cost is going to be for the same reason I've just been talking about. Instead of an over $600 million difference, that should have been one way to do it, divided by three, you're only talking about a $200 million difference that should have been traded off. It was error not to do that. Thank you, Your Honor. Mr. Harlow? Good morning. May it please the court. You heard Mr. Claybrook use the word expectation when he was talking about their unbalanced pricing argument. That's really where a lot of this argument falls apart because what XBO has done is they've taken a ratio between what they've called air shipments and ground shipments and they've superimposed what they believe the ratio for these two types of shipments should be over the ratio that's already built into the solicitation. There's a number of flaws with this argument that have been identified by the GAO and the trial court. What I'd like to focus on is what Judge Chen has illuminated with the evaluation that the agency actually did here. What they did is they went line item by line item using all three prices, both the Crowley's prices, XBO's prices, and the previous awardee's prices to determine an average, a coefficient of variation, a standard deviation. Then they went through and identified each line item price as either high or low. How can you identify a standard deviation with three data points? Ma'am, as far as the math behind that, I know they did that. As far as the formula that leads to standard deviation, I'm going to have to defer to the agency on that one. What they did is they compared each line item price to the average of those three and then determined whether or not each one was either high or low. What they also did was identify the percentage that that particular price occupied within an offeror's proposal. If a certain lane or What they did with all of that data that they accumulated was, as Judge Chen said, they determined that there was not unbalanced pricing as illustrated by these prices. They also determined that for Crowley, they demonstrated a clear understanding of the requirements of this solicitation. That stemmed from their ability to identify the specific percentages for each price in the offeror's overall proposal. How does this work? Does the individual bidder say, on this line, and you're going to have to correct everything that's wrong with what I say, on this line item, we're going to assume one unit at $2 million, but we get to say one unit and the other bidder can say 17 units? No, Your Honor. The units were set by the agency for all of them. There were 80 line items to start with. Each of those 80 line items spawned, as Mr. Claybrook indicated, 440,000 different prices. With those 440,000 prices, the agency used historical information when it was available for those particular routes. When it wasn't available, what they did is they assumed that each shipment would be the lowest possible weight within that band. If it was a 5,001 pound shipment going from Little Rock to Albuquerque, they assumed that it would be a 5,001 pound shipment. From those 440,000 prices, it spawned about 800,000 different contemplated shipments. Not necessarily projected, but shipments that would be priced for the solicitation. If you do the math behind all of that, you realize that it's about an 80-20 split between what XBO has called ground and air, which is not any different than what the agency argued before the GAO, or in fact, really what XBO suggested here. There just isn't any disagreement on what these shipments would look like. Where XBO is air is they've taken that same ratio and then they've doubled it by layering it on top of numbers that were already included in the solicitation. That has both the GAO and the chalkboard. Those spawn a lot of different problems with this argument, but ultimately we end up in the same spot where the agency performed the unbalanced price analysis that has been recommended by the Court of Federal Claims. If you look at the rationale that the agency gave for choosing that method, it tracks some of the language that the Court of Federal Claims has used with respect to an IDIQ and going line item by line item and identifying high and low prices. That's what they did in this case. That was their intent. If they were following decisions of the Court of Federal Claims that... Typical question. They don't do that in every case. Go line item by line item through 400,000 different line items. They only did it here because of a disparity between the overall offers. Is that right? Your Honor, I'm not sure what you mean by disparity. Because, I guess, one of the net price was quite a bit different than another net price. Between the offers or... I'm trying to not say any numbers, so yes. Why did they do this unbalanced pricing analysis in this case? They don't do it in every case, right? No, no. They noticed that there was a number of line items involved in this, so they knew that any procurement with a number of line items like this, they needed to accomplish that. That's what they set out to do. But, XBO's argument is you really only evaluated the line items that looked to be too high and didn't look at the line items that looked too low. That's what the trial court pointed out, too, is that the ultimate end of unbalanced pricing is whether or not there's a risk of the government paying higher prices in the end. That's what they focused on. They ruled that out. The agency ruled that out and said there isn't a risk of higher prices here, and therefore, there's not unbalanced pricing. That's where the trial court noticed, as Judge Chan did, if that outcome doesn't exist there, then there just is not unbalanced pricing. The reason there were so many of these line items and shipments is because this is a contract of a scope and magnitude that is almost unprecedented within the government. It encapsulates work that not only XBO has done in the past, but many other agencies, many other routes that a gigantic number. It incorporates, essentially, all DOD shipping and a variety of other agencies. How many people had to do all that line item comparison? How many man hours were devoted to that? Holy cow. I think it was about a half dozen people working on it. There are specific man hours. I don't know. I devoted a number of my own man hours to replicating the work that they had done to just double check it and make myself comfortable with it. There was a lot of man hours on my end, but for the agency, I can't speak to that. Anything further? Just that last argument with respect to price evaluation. What XBO's argument really is is that the solicitation contemplated two different types of price evaluations. One, the total value of your price that's identified in the solicitation, and something that XBO has called like the actual cost. The trial court rejected this argument on two grounds. The first was that even if XBO's argument is given any credence, all they've really done is identified an ambiguity in 2015. The trial court ruled that under Bloom Gold, this argument has waived if there's really any merit to it at all. The trial court went beyond that and found that the argument itself is substantively meritless because the text itself doesn't support XBO's interpretation that there's a second price evaluation metric within the solicitation. I think it's important to remember what the ultimate goal of this evaluation was, which was to have a comparative basis for the offeror's prices. Transcom's evaluation revealed that XBO's price was 8.4% higher. I know XBO likes to point out the difference in the TEP, but the agency pointed out their price is 8.4% higher. Now, in the trial court, XBO tried a number of different calculations for price to try to demonstrate that its price was somehow different than what the agency had found. What you always found under every circumstance was that their price was always 8.4% higher. There's simply no way to calculate price under this solicitation where XBO's price is not 8.4% higher than Crowley's. Ultimately, the agency determined that whatever technical advantage XBO may have had, it was not worth an 8.4% price premium. Thank you very much. Thank you. Let's hear from co-counsel. Thank you, Your Honor. May it please the court. I wanted to start by responding to Judge Chen's question about what would trigger a concern here of unbalanced pricing. Really, when you think about unbalanced pricing, one way to think about it, it's an extension of the price analysis that had to be done for a fixed price contract. Again, this is a fixed price contract such that any low prices, any underpricing of the contract is at the  end. The solicitation stated and the agency conducted a price analysis, which is the exercise of determining if any prices are too high, unreasonably high. The unbalanced pricing argument takes that analysis and applies it to the various different line items. Judge Moore, in response to your question, they did an unbalanced pricing analysis because the FAR says when there are line items to do that. The idea behind unbalanced pricing is to police against the possibility of certain line items being really low balled by a bidder in such a way that they couldn't actually reasonably possibly fulfill expected requirements for that given line item at that given price. Now there's a risk to the government that this particular bidder, if awarded the contract, would actually be able to perform that particular line item adequately. Is that the idea behind unbalanced pricing? I'm off? Yes, Your Honor, respectfully. Here, again, this is a fixed price contract, so really the only risk to the government is the risk of unreasonably high prices. If the government wanted to know the risk of low prices, a risk of performance and inability to perform, do what you say you're going to do, it could have added, and this is the exception, not the rule in a fixed price contract, it could have added a realism analysis to this. It could have said, we're not only going to look at price for reasonableness, we're also going to look at it for realism. Is your price realistic? It did not do that. In fact, now that XBO is arguing for, is essentially arguing, you must do a realism analysis. You must look at those low prices. It knew that that analysis was never in the solicitation. It in fact asked the United States to include that type of analysis in the solicitation, and Transcom did not revise the solicitation to do so. Really, how does this concern ever get triggered? It doesn't, because as Mr. Harlow explained, the government did its job of looking at all the high prices. So if there are no unreasonable... I'm sorry, I thought 48 CFR 15.401-1G says, all offers with separately priced line items or sublined items shall be analyzed and included for unbalanced pricing, which includes significantly understating, quote, the price of one or more line items. So I don't understand your argument that it's only, I thought the CFR required them to look at every line item, including a concern about understating prices of line items. Because it, quote, unquote, increases performance risk. Right. Am I misunderstanding what the CFR requires? Tell me again why I'm off base. Well, this unbalanced pricing provision is included within the entire scope of the price provisions of the FAR. It covers both cases where there is a cost reimbursable contract where you have to look at low prices. It covers a case where there might be a price realism where you're looking at an understanding, like I said before, the exception in a fixed price contract where you're looking to see if prices are realistic. And it also applies in this situation where there is a fixed price contract and no realism analysis whatsoever. When there is only... And the provision in G2 actually says this. You use cost analysis or price analysis to determine whether or not prices are imbalanced. Here, in this solicitation, the agency only provided for price analysis. So price analysis is the exercise of seeing if there are unreasonably high prices. So that's what the agency did. It did exactly what the G2 says. It did exactly what the solicitation said. Now, to get to your concern, would there ever be a risk that the government would face, the performance risk, which in a fixed price contract is unreasonably high prices, it only arises if you change the quantities in the solicitation. As a mathematical... It's mathematically impossible for Crowley's price to ever be higher than XBO's price given the ground rules of the solicitation and all of the quantities. We will always be 8.4% lower because the quantities in the solicitation. And that's why GAO held... I thought this was an IDIQ contract. What am I missing? It is an IDIQ contract, Your Honor, but the quantities were all specified. Every single quantity was specified in the pricing sheets of the solicitation. And so... Let me just correct me. This is my understanding of what Mr. Claybrook was saying. If you take the specified quantities for the calculation of the total evaluation price as a given, and you end up with numbers, and you're making a decision based on a significant part on which number is higher, that might not actually lead to the government, in the end, during the term of the contract, paying a lower price because realistically, it may turn out that the estimated quantities in the TEP calculation are way off that. Therefore, when you say 18 of these units, realistically, it's only going to be 2 of these units. And if you have a really, really low number for that line, it's going to multiply that disparity, that low number by 18, it's going to create a really significant helpful contribution to being lower on the TEP, when in fact, realistically, you're only going to do 2 of them. And if you do that enough times, the government's going to end up paying more, even though it chose the significantly lower TEP. Now, that's what I understand Mr. Claybrook to be saying, and that you had to do more than you did, not you, that they had to do more than you. I understand. Well, Your Honor, what that is, is a challenge to the estimated quantities in the solicitation, and as Mr. Harlow- I think what he's saying is, no, they're allowed to do the calculation on fixed quantities, but it can't stop there. They also need to figure out if there are sufficient disparities within some categories, whether those disparities realistically will propagate through into what the government will end up paying or not. Well, Your Honor, again, it is protected by the quantities, frankly, and here, the quantities, even as XBO has tried to challenge them and say, well, they might be different, we think they should be an 85-15 split, there's no evidence that anything in the solicitation or that there's anything other than an 85-15 split. The solicitation already reflects the historical expected quantities. There's no other analysis presented. There's no other evidence of a disagreement. There's no other evidence of a disparity. I'm sorry, so is your position that the government really did not even need to look at whether 85-15 or something is realistic, or that here they did need to look at it, but here there's no evidence of the sort that would actually support a claim that realistically the government is going to end up having to pay more than what the disparity in the TEP prices indicate? If I'm understanding your question, certainly if there were questions about whether or not the solicitation reflected anticipated quantities, that was something that XBO has been complaining about from the moment the solicitation was issued. Had they wanted TRANSCOM to correct that and reflect a different breakdown, that had to be done prior to proposals going in. As part of their analysis, though, the agency did exactly what it needed to do. It went through every single line item and looked at where there might be unreasonably high prices. That's what it's protecting itself against. It asked offerors about all of those prices. In many cases, got adjustments where the prices came down. In other instances, it got explanations for why the offeror's prices were what they were and satisfied themselves that the risk, the only risk in a fixed price contract that the government needs to worry about from a pricing perspective, is that the prices would not be unreasonably high. Without changing the quantities, we need to cut you off. Let's hear from Mr. Claybrook and let's add two minutes to his rebuttal time so we even out the time between the two parties. Thank you, Your Honor. First of all, continuing with Judge Sorrento's observations, we didn't double anything. When we did our analysis, what my esteemed colleagues want you to do is say, please just assume everything is accurate when we put in these plug numbers and it all will come out right. You know that's not correct. I agree with opposing counsel that if you wanted to change line item volumes, you had to do that before the proposals were in and you didn't. They make that argument, Your Honor. I agree with them, but that's correct. Well, Your Honor, it's not correct in this situation because you can't really challenge an unbalanced pricing analysis not being done properly. No, you can challenge the volumes in the TEP for each requested line item being inaccurate. This is a situation, Your Honor, in which they used historicals for where they had it, but where they didn't, they put plug numbers in. And if you doubted the propriety of those, you had to challenge them before proposals were in. That is not a protestable ground, Your Honor, because the agency, just like they did here, can say, we still want to get fixed prices for every one of these potential lanes that might be used. And it was the slims in which they were unreasonably low, unbalanced low, that they trebled them by saying, okay, three different timing, delivery times. Okay, but did they give you their quantities ahead of time? Yes, the quantities are in the RFP, but there's no... What's left of your argument? The point is they want to get a fixed price for every lane, even though, as they say, we don't expect to use all of these. There's nothing irrational about that. To do that, you must put a number in there. Otherwise, if you put a zero, because that's what you expect, or at least for half of them, zeros, then you're not going to get a price for it. So there has to be some plug number put in. That is not something we can protest. But as GAO pointed out in the first decision they made, because you have to put zeros in. If that is what ends up creating the risk that you're worried about, namely that it's quasi-fictional what these TEP figures are compared to what realistically the government will end up writing checks for, why is that not something that's part of the solicitation to which blue and gold applies? It is if you have historicals that you could use, but they don't have historicals here. Where they had them, they used them. So they're saying, yes, for once we don't, we have to put plug numbers in, and we multiply the lanes exponentially. And as GAO said in his first decision, okay, but you've got to be careful, because if this TEP thing is not letting you take a look at what the actual cost is, which is what it's all about, then maybe you need to change things. They came back and said, we don't need to change. As a matter of fact, we took into account and we did our trade-off that that TEP generated difference is not the actual cost difference. They said that we're going to do it exactly the same way, but they didn't do it, and that's the cause of our protest.